IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBERT C. VILLARE, M.D. and<br>DELAWARE VALLEY PHYSICIANS &<br>SURGEONS, PA,<br><br>          Plaintiffs,<br><br>v.<br><br>BEEBE MEDICAL CENTER, INC.;<br>CAPE SURGICAL ASSOCIATES, PA;<br>ERIK STANCOFSKI, M.D.;<br>SOUTHERN DELAWARE SURGERY<br>CENTER, LLC; JAMES SPELLMAN,<br>M.D.; and JAMES SPELLMAN, M.D.,<br>LLC,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civ. No. 08-950-SLR<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Kevin William Gibson, Esquire of Gibson & Perkins P.C., Media, Pennsylvania. Counsel for Plaintiffs.

Sean J. Bellew, Esquire and David A. Felice, Esquire of Ballard Spahr Andrews & Ingersoll, LLP, Wilmington, Delaware.  Counsel for Defendants.

**MEMORANDUM OPINION**

Dated:  July 1, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiffs Robert C. Villare, M.D. ("Villare") and Delaware Valley Physicians &
Surgeons PA ("DVPS") (collectively, "plaintiffs") filed their complaint in this antitrust
action in the Superior Court of the State of Delaware in and for New Castle County on
October 20, 2008. (D.I. 1, ex. A) The complaint asserted the following "counts" against
various defendants: (1) breach of contract and breach of the duty of good faith and fair
dealing (by defendant Beebe Medical Center, Inc. ("Beebe")) ("count I"); (2) interference
with present and prospective contractual relations (against Beebe)("count II"); (3)
interference with present and prospective contractual relations (against defendants
Cape Surgical Associates, PA ("Cape Surgical") and Erik Stancofski, M.D. ("count III");
(4) interference with present and prospective contractual relations (against defendants
Southern Delaware Surgery Center, LLC ("SDSC") and Dr. Stancofski) ("count IV"); (5)
breach of contract (against Beebe) ("count V"); (6) unjust enrichment (against
defendants Dr. Stancofski and Cape) ("count VI"); (7) civil conspiracy (against all
defendants) ("count VII"); (8) breach of contract and breach of the duty of good faith
and fair dealing (against SDSC) ("count VIII"); (9) a violation of the Sherman Act, 15
U.S.C. § 1 (against all defendants) ("count IX"); and (10) a violation of the Sherman Act,
15 U.S.C. § 2 (against all defendants) ("count X"). (*Id.*) Defendants removed the case
to this court on December 17, 1008 (*id.*) and, in lieu of an answer, filed a motion to
dismiss for failure to state a claim. (D.I. 5) For the following reasons, the court grants
defendants' motion with respect to plaintiffs' federal antitrust claims, remands plaintiffs'
remaining claims to the Superior Court for the State of Delaware, and denies as moot

defendants' motion to dismiss count III.

## II. BACKGROUND

Dr. Villare is a general surgeon specializing in thoratic and vascular surgery. (D.I. 1, ex. A at ¶ p) Dr. Villare was the sole shareholder and principal officer of DVPS, a private medical specialty practice. (Id. at ¶ 13) Beebe is a non-profit community hospital where Dr. Villare practiced medicine from his initial appointment to Beebe's staff in 1999 to 2005. (Id. at ¶¶ 10-12) Dr. Villare received a standard two-year appointment in 1999; he was subsequently re-appointed in 2001 and 2003. (Id. at ¶ 11)

James Spellman, M.D. is the Chief of Beebe's Department of Surgery and a principal of Spellman, LLC, a private surgical practice. (Id. at ¶¶ 7-8) Dr. Stancofski is a member of Beebe's Credentials Committee. (Id. at ¶ 30(m)) In 2005, Dr. Stancofski was medical director of SDSC and a principal of Cape Surgical, a private practice. (Id. at ¶¶ 4, 42)

By 2005, DVPS had matured into a reputable and successful practice. (Id. at ¶ 14) In February 2005, Dr. Villare sought a medical staff appointment at SDSC. (Id. at ¶ 40) Dr. Villare did not receive communications regarding this application until October 2005. (Id. at ¶ 42)

Dr. Villare's surgical privileges were set to expire at Beebe on July 30, 2005. (Id. at ¶ 16) The reapplication process at Beebe is generally covered by its bylaws, more specifically, the "Medical Staff Policy on Appointment at Beebe" (the "Appointment Policy"). (Id. at ¶¶ 17-18) Dr. Villare alleges delays in receiving his application for reappointment in violation of the Appointment Policy, but ultimately submitted his

2

application on June 7, 2005.  (*Id.* at ¶¶ 21-27)  Receipt was acknowledged on June 20, 2005, and Beebe thereafter sought additional information not previously provided by Dr. Villare in connection with his prior reappointments, for example, "documentation/evidence that will allow the organization to evaluate your clinical competence to perform" several procedures.  (*Id.* at ¶¶ 29-30)  Dr. Villare's appointment was extended through the October 2005 Board of Directors' meeting.  (*Id.* at ¶ 30)

Althouth Dr. Villare responded to the request for information, he was told by Dr. Stancofski that the Credentials Committee had not received his submissions.  (*Id.*)  Dr. Villare, believing that no prior applicants had been subjected to the type and extent of requests for information propounded upon him by Beebe, filed a lawsuit against Beebe in the Delaware Superior Court in New Castle County on October 4, 2005, wherein Dr. Villare alleged breach of contract.  (*Id.* at ¶¶ 31-32)  Dr. Villare was informed by letter dated October 24, 2005 that his application for reappointment was denied based upon: "(1) insufficient evidence of continued clinical competence; and (2) the evaluative bodies' inability to determine the precise privileges [he was] requesting."  (*Id.* at ¶ 33)

Dr. Villare stated his request to appeal the denial of his reappointment in a memorandum dated October 27, 2005, wherein he also requested clarification of the bases for Beebe's decision and an extension of his privileges.  (*Id.* at ¶ 34)  Dr. Villare's request to extend his privileges was denied by letter dated October 31, 2005 and his privileges expired November 1, 2005.  (*Id.* at ¶¶ 35-36)  Dr. Villare also received a letter from SDSC, dated October 31, 2005, requesting:  "(1) a written statement that Dr. Villare 'had no claims/settlements filed against [him] (closed or pending)'; and (2)

3

additional documentation of his laparoscopic training." (*Id.* at ¶ 42) Dr. Villare alleges that this request for information was outside of SDSC's standard credentialing application, not typically requested of SDSC's applicants, and nearly impossible to satisfy. (*Id.* at ¶¶ 45-47)

Dr. Villare received a letter acknowledging his appeal, dated December 15, 2005, which provided a list of proposed panel members pursuant to the Appointments Policy. (*Id.* at ¶ 37) Dr. Villare asserts that Beebe "failed to schedule a hearing date or provide the addresses of the proposed panel members as is required by Section 4B.03" of that Policy. (*Id.*) The list again was provided to Dr. Villare on January 10, 2006 but, again, no date or addresses were provided. (*Id.* at ¶ 38)

Dr. Stancofski informed Dr. Villare by letter dated December 9, 2005 that his application for privileges at SDSC was denied "because [Dr. Villare] did not have privileges at a hospital within 50 miles of SDSC as required by its bylaws." (*Id.* at ¶ 53) Dr. Villare alleges that Dr. Stancofski (a member of Beebe's Credentials Committee) knew on October 31, 2005 that Beebe denied Dr. Villare's application, and that Dr. Stancofski and SDSC intentionally delayed taking action with respect to Dr. Villare's application so that SDSC's decision would not be made until Dr. Villare's appointment at Beebe had expired. (*Id.* at ¶¶ 44, 51-52, 127)

Ultimately, Dr. Villare was forced to close DVPS because of the termination of his privileges at Beebe. (*Id.* at ¶ 39) In addition to Dr. Villare, DVPS formerly had a cardiothoracic surgeon, Dr. Mudiwa Munyiksa, M.D. in its employ. Dr. Munyiksa signed a four-year contract with DVPS in 2004. (*Id.* at ¶¶ 80-81) Plaintiffs assert that, in the

4

summer of 2006, Dr. Stancofski and Cape Surgical approached Dr. Munyiksa "so as to induce him to leave the employ of [DVPS] to become a full-time employee of Cape Surgical." (*Id.* at ¶ 83) Dr. Munyiksa was hired by Cape Surgical on September 5, 2006. (*Id.* at ¶ 87) DVPS, having no physicians with privileges at Beebe, closed thereafter. (*Id.* at ¶ 132)

## III. STANDARD

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 545, 554-55 (2007) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.*

> The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: "[S]tating...a claim requires a complaint with enough factual matter (taken as true) to suggest" the required element. This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element.

*Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d. Cir. 2008) (citations omitted).

5

Because plaintiff proceeds pro se, his pleading is liberally construed and his complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (citation omitted).

## IV. DISCUSSION

### A. Sherman Act Claims

The court first addresses plaintiffs' claims under the Sherman Act, or those claims over which it has original jurisdiction. In their "count IX," plaintiffs allege that "[d]efendants entered into a contract, combination or conspiracy to unlawfully force plaintiffs from conducting business in the Sussex County area in violation of § 1 of the Sherman Act, 15 U.S.C. § 1." (D.I. 1, ex. A at ¶ 146) In their "count X," plaintiffs generally allege that defendants "entered into a contract, combination or conspiracy to unlawfully prevent Dr. Villare from obtaining medical staff privileges at Beebe [and SDSC], thereby preventing him from providing services to his then prospective patients of the Sussex County area in violation of § 2 of the Sherman Act, 15 U.S.C. § 2." (*Id.* at ¶¶ 148-49) Plaintiffs similarly allege that defendants "entered into a contract, combination or conspiracy" to unlawfully prevent Dr. Villare from providing services to existing and prospective patients in the Sussex County area. (*Id.* at ¶¶ 150-51)

### 1. Plaintiffs' section 1 claim: intent to monopolize

Section 1 of the Sherman Act proscribes "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

6

States, or with foreign nations." 15 U.S.C. § 1. Under the rule of reason test,[1] the court must "decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). The Third Circuit has laid down four steps of proof that a plaintiff must allege to maintain a rule-of-reason claim: "(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and conduct pursuant to the contract or conspiracy were illegal; and (4) that the plaintiffs were injured as the proximate result of that conspiracy." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999).

In *Twombly*, the Supreme Court expressly addressed the pleading requirements under Section 1 of the Sherman Act. Specifically, the *Twombly* Court held that allegations that defendants "engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action," must be dismissed. 550 U.S. at 548-49. Put another way, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory

---

[1]Certain agreements or practices "because of their pernicious effect on competition and lack of any redeeming value are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 n.9 (3d Cir. 1996) (citing *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). Plaintiffs do not allege that defendants' conduct was illegal *per se*, and there is no indication that the *per se* rule would apply to the violation alleged in this case. Therefore, a rule of reason analysis is appropriate.

7

allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 556-57. Allegations made at the pleading stage must "plausably suggest[ ]" agreement. *Id.* at 556.

Unlike the complaint in *Twombly*,[2] the complaint at bar, read *in toto*, provides some "context that raises a suggestion of a preceding agreement." *Id.* at 557. Specifically, plaintiffs allege that, between February 17, 2005 (the date Dr. Villare applied to SDSC) and December 9, 2005 (the date Dr. Villare was notified that he was denied privileges at SDSC), Beebe and SDSC worked in concert to exclude Dr. Villare from both facilities. Without more, it would appear equally plausible that Beebe and SDSC each acted in their best economic interests; there would be no reason to infer that the facilities had, in doing "what was only natural anyway," entered into an antitrust conspiracy. *Id.* at 566. Plaintiffs have alleged, however, that Dr. Stancofski, in his dual roles as a member of Beebe's Credentials Committee and medical director of SDSC, influenced the decision-making process at both institutions so as to affect the exclusion of Dr. Villare from both staffs and eliminate Dr. Villare and DVPS as competitors in the market for thoracic and vascular care and surgical services.[3] This link suffices "to raise

---

[2]The complaint in *Twombly* mentioned "no specific time, place or person involved in the alleged conspiracies" and "furnishe[d] no clue as to which of the four [local exchange carriers accused of inhibiting the growth of competitive carriers through parallel conduct] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place." 550 U.S. at 565 n.10.

[3]Plaintiffs have not articulated a precise relevant market; however, insofar as defendants do not take issue with this fact, the court proffers a general definition of the relevant market derived from the facts as pled. This general description has no preclusive or forward-facing effect; plaintiffs, ultimately, would be required to prove a relevant market.

8

a reasonable expectation that discovery will reveal evidence of illegal agreement" (if

one exists). *Id.* at 556.

### 2. Plaintiffs' section 1 and 2 claims: interstate nexus

With respect to both plaintiffs' section 1 and 2 claims, defendants argue that

plaintiffs failed to plead an effect on interstate commerce.[4]  (D.I. 6 at 9-11)  This

argument was addressed by the Supreme Court in *Summit Health, Ltd. v. Pinhas*, 500

U.S. 322 (1991).  The complaint in *Summit* alleged that a single surgeon was excluded

from the market for ophthalmological services in Los Angeles because he refused to

follow a requirement to utilize a costly surgical assistant. *Id.* at 324.  The district court

dismissed the complaint on the grounds that it did not contain a factual nexus between

the restraint on this one surgeon's practice and interstate commerce.  The Court of

Appeals for the Ninth Circuit reversed, and the Supreme Court affirmed, holding that a

section 1 plaintiff "need not allege, or prove, an actual effect on interstate commerce to

support federal jurisdiction," as a section 1 violation "may be established by proof of

**either** an unlawful purpose or an anticompetitive effect." *Id.* at 330-31 (emphasis in

original).  The *Summit* Court further noted that

> [t]he competitive significance of respondent's exclusion from the market must be
> measured, not just by particularized evaluation of his own practice, but rather, by
> a general evaluation of the impact of the restraint on other participants and
> potential participants in the market from which he has been excluded.  We have
> no doubt concerning the power of Congress to regulate a peer review process

---

[4]The court notes that, in total, the parties provided less than 10 pages of briefing
regarding both of plaintiffs' antitrust claims.  As the court's analysis indicates, more was
required in this case.  It was ultimately defendants' burden to demonstrate that
dismissal is warranted in this case, notwithstanding, as discussed *infra*, the court must
dismiss insofar as there is no indication that plaintiffs have pled each of the required
elements.

> controlling access to the market for ophthalmological surgery in Los Angeles.
> Thus, respondent's claim that members of the peer review committee conspired
> with others to abuse that process and thereby deny respondent access to the
> market for ophthalmological services provided by general hospitals in Los
> Angeles has a sufficient nexus with interstate commerce to support federal
> jurisdiction.

*Id.* at 332-33. Notably, the *Summit* complaint did contain an allegation that defendants

engaged in interstate commerce. *Id.* at 327. Prior to its holding, the Court noted that

"[i]t seems clear . . . that [ophthalmological] services are regularly performed for out-of-

state patients and generate revenues from out-of-state sources[.]" *Id.* at 329-30.

Applying *Summit Health*, the Third Circuit has found the allegation that the

exclusion of a single physician from a market is sufficient to allege a section 1 claim; it

has done so, however, in instances where the complaint contained some allegation

regarding the regional nature of the services provided by (or money accepted by) the

hospital at issue. In *Brader v. Allegheny General Hospital*, the Third Circuit reversed

the dismissal of a physician's antitrust complaint where that complaint alleged that the

defendant hospital "serves as a regional hospital treating patients referred to it from

western Pennsylvania, eastern Ohio and West Virginia." 64 F.3d 869, 871 (3d Cir.

1995). In *Fuentes v. South Hills Cardiology*, the Third Circuit examined a complaint by

a physician who alleged, *inter alia*, that "[his] practice . . . generated a national

reputation and attracted out of state patients," that a "major portion of [defendant

hospital's] facilities had been financed by federal or out-of-state funds," and that its

revenue was in part derived from such funds. 946 F.2d 196, 201 (3d Cir. 1991). Noting

that no "specific quantum of interstate commerce affected" was required to be pled to

establish federal jurisdiction, the Third Circuit held that plaintiff's allegations provided a

10

basis for the Court to "infer . . . the unexpressed assumption that those out of state patients would not travel interstate but for Dr. Fuentes's care." *Id.* at 198. In *Brown v. Our Lady of Lourdes Medical Ctr.*, the United States District Court for the District of New Jersey inferred that the denial of plaintiff physician's application for staff privileges affected interstate commerce under *Summit Health* where his complaint "contain[ed] no allegations concerning the involvement of Our Lady of Lourdes in interstate commerce," but did allege that, as a cardiothoratic surgeon, plaintiff's trade "includes patients from interstate, and [is] a trade which has a substantial number of patients whose care is governed under the Medicare and other relevant medical laws of the U.S. Government." 767 F. Supp. 618, 626-27 (D.N.J. 1991).

Despite the fact that "no specific quantum" of allegations on this point is required, the court reads the foregoing authority to suggest that **some** allegation regarding a defendant hospital's or physician's interstate dealings is required to substantiate the court's assumption that the exclusion of a plaintiff physician from a hospital's medical staff affected interstate commerce. Despite this very low threshold, plaintiffs do not point to, and the complaint at bar does not appear to contain, any such factual allegations. For example, there is no indication that: (1) the medical services provided by Beebe or SDSC are regional; (2) either practice accepts federal funds; or that (3) Dr. Villare frequently treats out of state patients.[5] In fact, the complaint leads away from this conclusion because the plaintiffs have limited their allegations to the Sussex County area. Specifically, plaintiffs alleged that they "built a successful medical practice

---

[5]The court notes that plaintiffs are represented by counsel and that Dr. Villare has a history of litigation in the Superior Court of the State of Delaware.

in Sussex County and the general area in which Beebe is located," and that defendants unlawfully "force[d] plaintiffs from conducting business **in the Sussex County area**" and from providing services to "prospective patients **of the Sussex County area**." (D.I. 1, ex. A at ¶¶ 115, 146, 150) (emphasis added)  On the current record, the court declines to make the assumption espoused in *Summit Health*.

### B. Interference with Present and Prospective Contractual Relations (Tortious Interference with Contract)

Defendants have also moved to dismiss count III.  (D.I. 6 at 11-12)  The court need not address these arguments, insofar as the court remands plaintiffs' remaining state and common law claims to the Superior Court of the State of Delaware.

## V. CONCLUSION

For the foregoing reasons, the court grants defendants' motion to dismiss plaintiffs' antitrust claims (counts IX-X).  Plaintiffs' remaining claims (counts I-VIII) are remanded to the Superior Court of the State of Delaware.  An appropriate order will issue.